UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:16-cr-00034-MOC-DSC

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| Vs. ) | **ORDER** |
| ) | |
| **JAMES VICTOR BROADHURST,** ) | |
| ) | |
| Defendant. ) | |

**THIS MATTER** is before the court on Defendant James Victor Broadhurst's Motion to Suppress (#14) all physical and testimonial evidence obtained during a stop of Defendant that occurred on October 15, 2015. Defendant maintains that the officers illegally searched him based on a tip from an unreliable informant who was the initial suspect in an ongoing investigation. The court held an evidentiary hearing on June 20, 2016. Having considered the motion, the pleadings, and the credible testimony offered at the hearing, the court enters the following findings, conclusion, and Order.

**FINDINGS AND CONCLUSIONS**

I. **FACTUAL BACKGROUND**

In considering the facts underlying the claims for Defendant's motion, the court notes at the outset that at the hearing, it heard testimony from one witness, Officer Aaron Skipper, of the Charlotte-Mecklenburg Police Department ("CMPD"), and viewed several videos taken by police body cameras depicting the encounters in question between the police and parties involved. The court finds all of the testimony by Officer Skipper to be credible and that the

1

videos accurately depicted the events as they unfolded on October 15, 2015. The relevant facts that gave rise to Defendant's motion are as follows.

On October 14, 2015, a citizen ("C.M."), reported to CMPD that he was the victim of an armed vehicular theft at Tuckaseegee Road in Charlotte, N.C. C.M. instructed officers that the suspect had waved him down and asked him for a ride to a nearby store. Once at the store, the suspect brandished a black semi-automatic firearm and instructed C.M. to drive to a different location where he proceeded to rob C.M. of the contents in his pockets. Then the suspect drove off in C.M.'s brown Pontiac Montana Minivan. C.M. described the suspect as a black male wearing a black jacket, black jeans, and a black hat with a moustache and a beard.

On the following day, October 15, 2015, C.M.'s wife called their car dealership to report that the car had been stolen. The dealership was able to shut off the car engine and provide the location of the vehicle via GPS, which indicated that the car was at the intersection of Drury Drive and West Craighead Road in Charlotte. C.M.'s wife advised CMPD Officer C.R. Tolley about the location of the vehicle after encountering him on the street. Officer Skipper ran the tags on the vehicle and obtained the report of the armed carjacking, which contained the suspect description.

Officer Tolley responded to the reported GPS location while wearing a body video camera. Officer Tolley located the car parked behind a residence in that block of Drury Drive. Officer Tolley summoned other CMPD officers to respond to that location to assist in the investigation.

While on his way to assist Officer Tolley, Officer Skipper stopped his vehicle and got out to question a man on the street who matched the suspect description. Officer Skipper's video showed that he explained to the man that the police were looking for a man who matched his clothing and facial hair description. The man provided his identification and consented to a pat

2

down. Officer Skipper testified that he felt the need to pat him down given the report of an armed carjacking. After running the man's identification and discovering no weapon on him, Officer Skipper thanked the man for his time and that encounter ended. Officer Skipper then proceeded to the house on Drury Drive to assist Officer Tolley.

At the house where the car had been located, Officer Tolley encountered a resident of the address who fit the description of the carjacker (hereinafter, "Resident"). Initially, Resident was hostile and uncooperative—he went inside of his home and would not open the door to speak with Officer Tolley. Eventually, Resident opened the door and proceeded to talk with Officer Tolley and other officers that had responded to the residence. Upon learning that he was being recorded by the officer's body video cameras, Resident became more cooperative with the police. Resident allowed the officers to conduct a walk through search of the residence for other potential suspects. No other suspects were located, although another man who did not match the suspect description was inside Resident's home. As the two were providing police with their identification, Resident informed Officer Tolley that a man who goes by "Tank" brought the van into his yard three hours prior, and that "Tank" had just walked down the street wearing a red shirt and ball cap. However, Resident would not elaborate any further, claiming he wasn't a "rat."

After obtaining this information from Resident, Officers Skipper and Burton continued the investigation and proceeded to search for "Tank" while Officer Tolley and the other officers remained at Resident's residence. Officers Skipper and Burton proceeded down Drury Drive in their vehicles, and noticed a man standing in the middle of the street about five houses down, looking in their direction. The man then entered the gated yard at that house and sat in a chair on

the front porch. Neighbors on either side of the residence pointed out the man to the officers. The man, later determined to be Defendant, was wearing a black ball cap, red shirt, and dark jeans.

The officers approached Defendant and proceeded to question him. Defendant informed the officers that his friend lived at the residence, and Defendant was waiting for him to return home. When officers questioned Defendant about his identity, Defendant gave them a name that he could not spell and a birth date that did not match the age he claimed to be. Further, Officer Skipper testified that Defendant's hands were constantly shaking, rendering him unable to light a cigarette after many attempts. Throughout this questioning, Defendant was seated in the porch chair, leaning forward and resting both elbows on either knee.

The officers indicated to Defendant that they were concerned he may have a weapon. Defendant denied having any weapons and told the officers he would not consent to any search without a warrant. Officer Skipper observed a square-edged bulge in Defendant's front left pants pocket, which he believed may be a concealed weapon. Defendant eventually consented to a pat down of his front pockets only, but refused to stand up for the frisk. The officers secured Defendant's arms and lifted him up from the chair to perform the pat down. Ultimately, the officers found a firearm concealed in Defendant's front right waistband. A further search of his person revealed, inter alia, a key chain containing a GM key and key fob in his front right pants pocket. Officer Skipper later confirmed that the key and fob engaged the stolen Pontiac's alarm system and worked the driver's side door.

On February 16, 2016, Defendant was charged by Bill of Indictment in the Western District of North Carolina with a single violation of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm).

## II. DEFENDANT'S MOTION TO SUPPRESS

### A. Defendant's Contentions

Defendant moves the court to suppress all physical and testimonial evidence obtained by CMPD as a result of the search and seizure of Defendant on October 15, 2015. Defendant asserts that Resident, the initial suspect in the investigation who was uncooperative, could not provide reasonable suspicion nor probable cause to detain and search Defendant. Defendant claims that the search violated his Fourth Amendment right to be free from unreasonable searches and seizures because CMPD frisked Defendant solely on the basis of an unreliable tipster.

### B. Discussion

The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Fourth Amendment is a personal right that must be invoked by an individual. Minnesota v. Carter, 525 U.S. 83, 88 (1998) (citing Katz v. United States, 389 U.S. 347, 351 (1967)). A law enforcement officer may, consistent with the Fourth Amendment, initiate a brief investigatory stop if he has reasonable suspicion to believe that criminal activity "may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). A lawful investigatory stop (a "Terry stop") allows an officer to pat down or frisk the person stopped for weapons if the officer has a reasonable, identifiable suspicion that the person he has stopped may be armed and presently dangerous. Terry, 392 U.S. at 30. A mere hunch or suspicion does not warrant a permissible basis for a Terry stop. Id.; Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000). Though the facts of the situation need not give rise to probable cause, the officer must be able to give an objectively reasonable suspicion of criminal activity. See e.g., United States v. Arvizu, 534 U.S. 266, 274 (2002).

The reasonable suspicion to justify a Terry stop is determined by whether "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27. The existence of reasonable suspicion depends on the totality of the presented circumstances. United States v. Singh, 363 F.3d 347, 354 (4th Cir. 2004). The Supreme Court has recognized that this reasonable suspicion inquiry should allow officers "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Arvizu, 534 U.S. at 273 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (2002)).

In weighing the totality of the circumstances, officers rely on various factors which may give rise to reasonable suspicion that criminal activity may be afoot. See United States v. Brignoni-Ponce, 422 U.S. 873, 855 (1981) (noting whether the suspect engaged in evasive behavior or acted nervously); United States v. McFarley, 991 F.2d 1188, 1192 (4th Cir. 1993) (identifying nervous behavior as shaking hands, heavy breathing, and providing inconsistent answers). Ultimately, the basis for a Terry stop is that the officer has a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Mayo, 361 F.3d 802, 806 (4th Cir. 2004) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).

In cases where an informant's tip supplies part of the basis behind the reasonable suspicion, a court must ensure that the tip is sufficiently reliable. United States v. Perkins, 363 F.3d 317, 323 (4th Cir. 2004). When an informant gives information to an officer face-to-face, an officer may judge the credibility of the tipster firsthand to confirm if the tip is sufficient to support reasonable suspicion. Id. See also Adams v. Williams, 407 U.S. 143, 146-47 (1990)

(discussing face-to-face tip from known source), United States v. Christmas, 222 F.3d 141, 144 (4th Cir. 2000) (discussing face-to-face tip from unknown source). Tips fall on a spectrum of reliability, and under the Fourth Amendment, a court must take into account all the surrounding factors in assessing a tip and the totality of the circumstances supporting a Terry stop. Perkins, 363 F.3d at 324.

Courts have considered a variety of factors in cases where the officer met with an informant in a face-to-face encounter to determine whether the officer had reasonable suspicion to effect a Terry stop. Courts have considered whether the informant reported the issue to the police in public, thus exposing themselves to potential retaliation from the suspect and in turn bolstering the informant's credibility. Christmas, 222 F.3d at 144. Further, courts also look to the informant's proximity to the reported activity in determining informant credibility. See e.g., id.; Perkins, 363 F.3d at 322.

In Christmas, the Fourth Circuit addressed a situation regarding an intoxicated informant who tipped police off about her neighbor's narcotic and gun activity. The court upheld the district court's finding that a face-to-face encounter with an informant, albeit an intoxicated informant, supported credibility of the report in regards to a later Terry stop because: (1) the informant's residence was within close proximity of the illegal activity and (2) the informant was in close proximity to the illegal activity when informing the officers. Christmas, 222 F.3d at 144. The Fourth Circuit found that unlike an anonymous tipster, an informant who speaks directly to an officer can be held accountable for false statements, thus exposing themselves to repercussions of misleading the police and bolstering the tipster's credibility. Id. In looking at the totality of the circumstances, the court found that the tip furnished reasonable suspicion for the Terry stop. Id.

7

Here, Defendant was unquestionably entitled to the protection of the Fourth Amendment as he sat on the porch during the police questioning. The question before the court is, considering the totality of the circumstances, whether this stop and frisk encounter constituted a legal Terry stop in conformance with the Fourth Amendment. Defendant argues that the officers violated his Fourth Amendment rights by relying on Resident's tip without any corroboration that Defendant was involved in the carjacking, and further by relying on that testimony as a probable cause to detain and search Defendant. The court finds that Defendant's argument is foreclosed by <u>Terry</u> and the Fourth Circuit's holding in <u>Christmas</u>.

Defendant argues that <u>Christmas</u> is distinguishable from the case here because Resident was the lone suspect in the case, caught with the stolen car in his backyard, matched the description of the perpetrator of the carjacking, and was determined to obstruct the investigation even as he attempted to shift suspicion away from himself. Thus, as Defendant notes, Resident was not merely a concerned citizen offering information about a criminal investigation to police; he had an interest in deflecting the police's interest in him as a primary suspect. The court finds that Defendant's attempt to distinguish <u>Christmas</u> is ultimately unconvincing for several reasons. First, while Resident was initially uncooperative with police, he ultimately allowed them to enter his home, conduct a search, and offer information about the stolen vehicle in the yard. Resident claimed to have knowledge of how the car got there and who had the keys, insisting that the person with the keys had just left the house. Both Resident and his residence were within close proximity to the illegal activity, as the stolen car was parked in his back yard. Ultimately, Defendant was standing in the road five houses down the street. The physical proximity is analogous to the facts in <u>Christmas</u> where the informant was a neighbor to the illegal activity.

Further, Resident detailed the information he knew about the stolen vehicle to officers face-to-face while they were in his residence.

The court has also considered whether the fact that Resident gave information to the police inside his home, as opposed to in public, has any bearing on Resident's reliability. Here, CMPD was conducting an ongoing investigation of an armed carjacking. This ongoing investigation led the officers to question other individuals who fit the suspect's description before Resident, but then singled in on Resident once the vehicle was located on his property. Because of police presence at Resident's home and his lengthy interaction with police in his front yard, the public would be on notice of police interest in Resident. Further, after Resident gave the officers the information about "Tank," Officers Skipper and Burton immediately proceeded to follow the lead in the investigation in an attempt to determine whether Resident's admonition was credible, and if so, to garner more information from "Tank." Therefore, although Resident informed the police inside his residence, in looking at the circumstances as a whole, any onlooker would observe Resident aiding the police, despite him being the initial suspect. Thus, as in <u>Christmas</u>, Resident's public tip to the police bolsters his credibility as an informant.

Ultimately, whether or not Resident was actually involved in the carjacking, he claimed to have some knowledge of the crime. He pointed Defendant out to the officers in a manner where the public and perpetrator of the crime could observe and potentially retaliate against him. Considering the facts at issue, the officers acted reasonably by following Resident's lead and continuing the active investigation. As Resident was still the initial suspect with the stolen car in his back yard, Officer Tolley and other officers remained with Resident as Officers Skipper and Burton searched for "Tank." Considering the facts of this case, the police reasonably further investigated an ongoing case based on the reliable tip from Resident, while still not abandoning

the possibility that Resident was involved. Thus, similarly to the scenario in <u>Christmas</u>, Resident was a reliable tipster when looking at the totality of the circumstances.

The court also finds that considering the totality of the circumstances presented to the officers in this case, the Terry stop was lawful. First, the officers had reasonable suspicion that criminal activity was afoot and that Defendant was armed and dangerous because they were following up on a lead in an investigation for an armed carjacking. Upon receiving the tip from Resident that the perpetrator of the carjacking had just recently walked up the street wearing a red shirt, the officers found Defendant (wearing a red shirt) standing in that street. Upon seeing the officers, Defendant went and sat down on a front porch. Neighbors, seeing officer presence in the street, pointed at Defendant. Once the officers began talking to Defendant, he provided false identification information, appeared extremely nervous, persistently covered his waistline, refused to stand up, and had a square-edged bulge in his front left pants pocket. Despite the fact that the bulge was later identified as a pack of cigarettes, the court must look to whether the search was reasonable or not considering the totality of the facts at issue. Here, the court finds that the totality of the circumstances provided the officers sufficient reasonable suspicion that not only was criminal activity afoot as a result of the carjacking, but also that Defendant was potentially armed and dangerous. The court thus finds that the pat-down of Defendant was reasonable and not in violation of the Fourth Amendment.

**ORDER**

**IT IS, THEREFORE, ORDERED** that Defendant's Motion to Suppress (#14) is **DENIED**.

Signed: July 6, 2016

Max O. Cogburn Jr
United States District Judge

10